AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

District of New Hampshire

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) | Case No. 1:21-mj-44-01/03-AJ |
| THE PREMISES LOCATED AT 208 CANDIA ROAD, CHESTER, NH, A GRAY 2020 NISSAN ARMADA WITH NH REG. # 4835075 AND VIN JN8AY2NC1LX516489, AND THE PERSONS OF MOISES RUIZ PADILLA, AND JENNIFER SCOTT (a/k/a JENNIFER SCOTT RUIZ) | ) ) ) ) | |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

Please see attachments A-1 through A-3.

located in the _____ District of _____New Hampshire_____ , there is now concealed *(identify the person or describe the property to be seized)*:

Please see attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 7 U.S.C. 2156 | - Animal Fighting Venture Prohibition |

The application is based on these facts:

Please see attached affidavit.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

/s/ Kyle Bishop

*Applicant's signature*

Special Agent Kyle Bishop, USDA - OIG

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by **Telephonic conference** *(specify reliable electronic means)*.

Date: _____03/03/2021_____

*Andrea K. Johnstone*

*Judge's signature*

City and state: Concord, New Hampshire

Hon. Andrea K. Johnstone, U.S. Magistrate Judge

*Printed name and title*

## AFFIDAVIT IN SUPPORT OF APPLICATION
## FOR SEARCH AND SEIZURE WARRANTS

I, Special Agent Kyle Bishop of the Office of Inspector General, United States Department

of Agriculture, being first duly sworn, hereby depose and state:

## INTRODUCTION AND AGENT BACKGROUND

1.      I am a Special Agent with the United States Department of Agriculture, Office of

Inspector General ("USDA-OIG"). As such, I am an "investigative or law enforcement officer"

within the meaning of 18 U.S.C. § 2510(7) in that I am an officer of the United States who is

empowered by law to conduct investigations and to make arrests for federal felony offenses.  I

also am a "federal law enforcement officer" within the meaning of Rule 41 of the Federal

Rules of Criminal Procedure.

2.      I am a graduate of the Criminal Investigator Training Program at the Federal

Law Enforcement Training Center. I am also a graduate of the Rhode Island Police

Academy and the U.S. Coast Guard Maritime Law Enforcement Academy. I have

completed over 40 law enforcement trainings between 2012 and the present including

"Investigating Animal Abuse for Law Enforcement" and "Investigating and Prosecuting

Bloodsports." I hold a bachelor's degree in criminal justice.

3.      As a Special Agent with the USDA-OIG, I am authorized to conduct and

supervise investigations relating to the programs and operations of the United States

Department of Agriculture; to make arrests, execute warrants, and carry firearms as

authorized by the Agriculture and Food Act of 1981 (P.L. 97-98); and to exercise all duties

and responsibilities authorized by the Inspector General Act of 1978 or incident thereto,

including the authority to obtain United States Department of Agriculture records and

information, to administer oaths, and to undertake other duties as necessary in support of the mission of the Office of Inspector General.

4.     The USDA-OIG, Homeland Security Investigations (HSI), and the Chester, New Hampshire Police Department are investigating Moises Ruiz Padilla (PADILLA) and Jennifer Scott (aka Jennifer Scott Ruiz) (SCOTT) of 208 Candia Road in Chester, New Hampshire for engaging in activities relating to illegal animal fighting ventures in violation of 7 U.S.C. § 2156(a) including sponsoring or exhibiting an animal in, and attending, or causing an individual who has not attained the age of 16 to attend, an animal fighting venture.

5.     In preparing this affidavit, I have prepared reports and reviewed reports prepared by other officers and agents regarding interviews, surveillance, and other investigative efforts in this investigation. In addition, I have discussed this investigation with other officers and investigators involved in the case. Accordingly, I am familiar with all aspects of this investigation. While this affidavit contains all material information pertinent to the requested search warrant, it does not set forth all of my knowledge about this matter.

6.     Based on the facts set forth in this affidavit, there is probable cause to believe that violations of Title 7, United States Code, Section 2156, "Animal fighting venture prohibition," (the "Subject Offenses") have been committed, are being committed, and will be committed by SCOTT and PADILLA, and others known and unknown. Probable cause exists to believe that evidence, fruits, and instrumentalities of the aforementioned criminal violations will be located at 208 Candia Road in Chester, New Hampshire including the residence, property, outbuildings (barns, coups, keeps, and other animal housing), and utility trailers ("Target Premises"), in a grey 2020 Nissan Armada with New Hampshire registration 4835075 and Vehicle Identification Number (VIN) JN8AY2NC1LX516489 ("Target Vehicle"), and on the persons of SCOTT and

PADILLA.

## **TARGET OFFENSES**

### The Federal Animal Welfare Act

7.      The federal Animal Welfare Act defines "animal fighting venture" as "any event, in or affecting interstate or foreign commerce, that involves a fight conducted or to be conducted between at least 2 animals for purposes of sport, wagering, or entertainment." 7 U.S.C. § 2156(f)(1). It is illegal to sponsor or exhibit an animal in an animal fighting venture. 7 U.S.C. § 2156(a)(1). It is also illegal to possess, train, sell, buy, transport, deliver or receive an animal for purposes of having the animal participate in an animal fighting venture. 7 U.S.C. § 2156(b). Further, the statute prohibits knowingly selling, buying, transporting, or delivering in interstate or foreign commerce knives, "gaffs," and other sharp instruments attached, or designed or intended to be attached, to the leg of a bird for use in an animal fighting venture. 7 U.S.C. § 2156(d).

8.      The Animal Welfare Act also makes it a crime to knowingly use the mail or any instrumentality of interstate commerce for commercial speech for advertising a fighting animal, or promoting or furthering an animal fighting venture. 7 U.S.C. § 2156(c). All of these offenses are felonies punishable by up to five years in prison. 7 U.S.C. § 2156(i); 18 U.S.C. § 49.

9.      Additionally, it is unlawful for any person to knowingly attend an animal fighting venture or knowingly cause an individual who has not attained the age of 16 to attend an animal fighting venture. 7 U.S.C. § 2156(a)(2).

10.      The Secretary of Agriculture is authorized to enforce the Animal Welfare Act, which provides that, "[t]he Secretary or any other person authorized by him shall make such investigations as the Secretary deems necessary to determine whether any person has violated or

is violating any provision of this section." 7 U.S.C. § 2156(e).

## FACTUAL BACKGROUND – ANIMAL FIGHTING

11.     The statements in this section are based on my training and experience investigating animal fighting ventures, and on information provided to me by other law enforcement personnel.

12.     In the United States, cock fighters often participate in cockfighting tournaments called "derbies," where large numbers of cock fighters will pit their roosters against one another for the entertainment of others and to enrich themselves financially. Cockfighting spectators gamble on the outcomes of the cock fights, and the owners of the animals stand to gain financially either through their own wagers, through an arrangement with the host of the cock fight, or through the enhanced value of their winning gamecocks.

13.     Roosters have a natural bony spur on the back of their leg.  This spur is used by the rooster to cause injury to other animals when it kicks with its leg. This is the rooster's primary means of inflicting injury.  Cock fighters may trim the bird's natural spur to the desired length to fit a boot with which an implement known as a "gaff" or knife is equipped to enhance the bird's ability to cause more damage. Typical cock fights employ the use of weapons that are attached to the backs of the birds' legs. The gaff is an icepick-like implement that is strapped to both legs and designed to cause puncturing damage, while knives come in different sizes (short knife or long knife) and are designed to cause slashing or stabbing damage to the opponent bird. These weapons are also called long heels, short heels, jaggers, bayonets, Texas Twisters, socket knives, long knives, short knives, slashers, and postizas in other parts of the country and the world. These weapons are attached to a small, soft leather collar referred to as a "boot." The

boot is used to hold the weapon which is then wrapped around the bird's ankle and fit by means of the boot's hole over the shaved down spur of the bird.

14.     Due to the enhanced stabbing and slashing ability bestowed upon the birds by the manmade weapons, cockfighting is an extremely painful, bloody, and deadly event. Birds are stabbed, slashed open, eviscerated, and partially decapitated. Birds that lose a match most often die. It is not uncommon for winning birds to die shortly after a fight or be unable to continue in the derby because of mortal wounds.

15.     Cock fighters take pride in their gamecocks and breed them as others might breed nonfighting animals. Cock fighters select their animals for the traits they value – size, toughness, and aggression – and may enhance the performance of the animals using veterinary drugs. Cock fighters then train their gamecocks to fight, often to the death.

16.     Owners/operators of cockfighting arenas, called "pits," hold organized fights where many people can fight their trained birds against the fighting birds of other people. These arenas, depending on the level of sophistication, will have multiple pits to host "main fights," and "drag pits" to accommodate fights in the main pit that have lasted too long and lost the interest of the spectators. In a "drag pit," the birds are not always actively engaging one another. The function of a "drag pit" is to see allow the fight to continue to determine which bird concedes or dies. These arenas will often have permanent stadium-style seating, electricity, plumbing, concessions, and ample parking for participants and spectators.

17.     Owners often have schedules professionally printed that show the dates of the fights that people can enter and spectate. Owners distribute these schedules by various means to enhance participation and attendance at their organized fights.

18.     Owners charge participants a set fee to enter his or her birds into a derby. This fee

may be anywhere from one hundred dollars to tens of thousands of dollars, depending on the event. The winner of the match, derby, or hack is the person whose birds have the best overall win/loss record. This person wins the "pot" or fees collected by the other participants. If multiple people tie with the best win/loss record then the pot is split between them.

19.     Owners enrich themselves by keeping a percentage of the pot, charging participants for extra "options" (which may increase a participant's chance of winning more money), charging spectators to park at the pit, charging a fee for spectators to get into the event, selling food and drinks at the event, selling gaffs and other bird fighting supplies, charging vendors to set up booths at the pit, charging premiums for preferred seating, charging annual rentals of VIP rooms at the pit location, and charging annual fees for bird keeps at the pit location. A keep is a wooden hut with multiple compartments to house and segregate a contestant's fighting birds while they attend the event.

20.     Persons engaged in cockfighting breed, buy, sell, and traffic in specialized strains of roosters bred specifically for cockfighting. These strains are called by names such as "Sweater" and "Claret," which refer to the "bloodline" of the bird. These bloodlines or strains of birds have been purposefully bred for cockfighting. Particular strains known for their winning records in cockfighting matches are prized by users. Since many cock fighters will "go through" dozens or even hundreds of birds a year competing at derbies, there is ample commerce in fighting birds between cock fighters.

21.     Roosters are trained to cockfight through the use of various physical training methods as well as "sparring" with another rooster with the spurs of both roosters covered with "sparring muffs." The roosters are often groomed in certain distinct ways including the removal of the comb and wattle as well as the shaving of the legs. According to the Humane Society of

the United States, cockfighters will "trim out" a rooster before a fight which usually includes shortening the long tail feathers (sickle feathers) and wing primaries and removing some back, saddle, and vent area plumage with the intent to reduce some of the bird's weight and the possibility of overheating during a fight. On average, fighting cocks weigh between four and six pounds and are matched against a bird of equal weight within several ounces. Vitamins, drugs, and veterinary supplies are used in cockfighting to increase the performance of roosters, and to treat injuries to the animals.

22.     Because of the nature and training of these animals, birds bred to fight are prized amongst those individuals who engage in these ventures and owners often boast about the prowess of their birds, including using social media.  Birds may be transported from state to state as the result of sales and purchases.  Birds may also be transported interstate in order to be housed in advance of the fights. Supplies and feed are often transported interstate.  Possession of the birds is not, standing alone, illegal; nevertheless, owners of the birds may take steps to disguise the nature of the activities for which the birds are used by falsely labeling packages in which the birds are shipped or which contain the fighting implements that are used such as the gaffs.

23.     The birds are, by nature, relatively noisy. The housing of many of these animals may require large and/or remote areas or buildings. Control of a cockfighting venue may involve many responsibilities including making all arrangements necessary to conduct the meet. According to the Human Society of the United States, responsibilities may include scheduling events and setting the entry fees; providing the pits (the area where the fight is held) and all other supplies; selecting the matchmakers, timekeepers, and referees; and arranging for security precautions. The promoter sets and collects admission fees as part of his or her income and may

also collect entry fees from the owners of the birds. Depending on the location of the fighting venture, small sheds may be rented out to cock fighters traveling from a distance. As noted infra, gambling on cockfights is a large part of the allure. The promoter may collect fees and be responsible for paying out after a win.

24.     Based upon my training, experience, and involvement in prior investigations, I know that individuals who are engaged in animal fighting may use residences to house and train animals used in animal fighting ventures. Individuals involved in cockfighting may also use their residences to store animal fighting implements, training aids, veterinary medicines and equipment, records of training and bloodlines, and illegal gambling proceeds (cash and cash equivalents).

## **PROBABLE CAUSE**

25.     On or about June 29, 2020, the Chester, New Hampshire Police Department received a citizen compliant regarding the suspected keeping of roosters for cockfighting on the 15.75-acre property located at 208 Candia Road in the Town of Chester, New Hampshire. The citizen went to 208 Candia Road where he spoke with the homeowner who identified herself as SCOTT. During the conversation, SCOTT stated that the roosters on the property were being raised for cockfighting. SCOTT possesses a New Hampshire driver's license with address of 208 Candia Road. SCOTT and PADILLA have a total of 12 vehicles actively registered to 208 Candia Road as of December 2020.

26.     On or about July 22, 2020, Patrolman Trevor Gardner of the Chester Police Department responded to a residential fire alarm activation at 208 Candia Road. Patrolman Gardner met with the homeowner, SCOTT, at the residence. He observed approximately 100

roosters kept in multiple structures constructed using wood and chicken wire throughout the property. Additionally, Patrolman Gardner observed approximately five male adults on the property in the vicinity of the rooster housing. The males abruptly departed the residence upon the arrival of Patrolman Gardner who is a uniformed police officer and was operating a marked police vehicle.

<u>Facebook Accounts of SCOTT and PADILLA Show Evidence of Cockfighting</u>

27.     I reviewed a Facebook account in the name "Jen Rulz" with a universal resource locator (URL) of https://www.facebook.com/jen.ruiz.92 used by SCOTT (the "SCOTT account"). The SCOTT account features pictures of SCOTT as the account holder that match her U.S. passport photograph. Additionally, the location of the tattoos listed in the criminal history for SCOTT match the tattoos displayed in Facebook photos for the account holder.

28.     On July 26, 2019, the SCOTT Facebook account posted multiple pictures with accompanying comments which suggested that SCOTT and PADILLA were having a vacation house built in Mexico. One picture posted by the SCOTT account shows adult roosters housed individually in single enclosures. Adult roosters bred for cockfighting, based on their inherent aggressiveness, must be housed individually to prevent unintended violence outside of an organized cockfight which may result in the unwanted injury or death of animals. The picture shows roosters that appear to be housed in a way consistent with the keeping of roosters

intentionally bred for aggressiveness and use in cockfighting:



29.    Additionally, the picture shows roosters with physical alterations to their bodies. Individuals involved with cockfighting often intentionally alter anatomical features of roosters to increase the effectiveness of the animal in fights which will improve the likelihood of gambling success and the resulting financial profit. The picture below shows the anatomy of a rooster in its natural form.



30.     The picture posted by the SCOTT account shows one or more of the roosters with

dubbed combs and trimmed wattles. The removal of these appendages is advantageous for

cockfighting to prevent injury and infection as well as problems associated with frostbite in

colder climates. An injured rooster comb will bleed profusely when cut and can significantly

impair the ability of the animal to see and fight. Additionally, the removal of the comb and

wattle will reduce the overall weight of roosters. The picture also shows the absence of spurs on

at least one rooster. Individuals involved in cockfighting usually cut the natural spurs of roosters

leaving only a short stump that serves as an anchor point for attaching the artificial spurs or gaffs

to increase the lethality of the animals for fighting.



31.     I reviewed a Facebook account in the name "Moises Padilla" with a universal resource locator (URL) of https://www.facebook.com/moises.padilla.73113/. The account features pictures of PADILLA as the account holder that match his Immigration and Customs Enforcement booking photograph. The PADILLA Facebook account is "Friends" with several other accounts with suspected cockfighting associations including Hatch Village Farms and Blackwater Farm that both appear to sell roosters for cockfighting. The PADILLA account is also "Friends" with an account in the name Carol Nesmith (https://www.facebook.com/carol.nesmith.3) that contains content that appears to be associated with cockfighting including pictures of suspected cockfighting trophies, individually housed and tethered roosters, and roosters with removed wattles and combs.



Travel to Cockfight in North Carolina, November 27-29, 2020

32.    On or about December 1, 2020, Chief Aaron Berube of the Chester Police

Department received a telephone call from Karen Lacroix who is the principal of the Chester

Academy, a public K-8 grade school in Chester, NH, regarding information related to

cockfighting. Principal Lacroix advised Chief Berube that a ten-year-old student made a

comment to a paraprofessional educator indicating that she traveled to North Carolina during the

past weekend with her parents to fight roosters. She continued to say that her family needed two

cars to transport the quantity of the roosters being delivered to North Carolina and her family

made a significant amount of money from the roosters. Principal Lacroix also stated that a 14-

year-old student made a comment to a teacher indicating that he was absent from school on

Monday, November 30, 2020 because his family returned from North Carolina at a very late

hour on Sunday night. Both students are believed to be the children of SCOTT and PADILLA.

33.     The Target Vehicle and a black 2018 Chevrolet Silverado with New Hampshire

registration 4386291 are among the 12 total vehicles actively registered to SCOTT and/or

PADILLA at the Target Premises. Both the Subject Vehicle and the Chevrolet Silverado

("Vehicle 2") are registered to SCOTT. During the weekend of November 27-29, 2020,

automated license plate reader (ALPR) assets in multiple states along the East Coast of the

United States documented the travel of the Target Vehicle and Vehicle 2 from Friday, November

27 to Monday, November 29, 2020. ALPR showed that both vehicles traveled south along the

Interstate 95 corridor on Friday, November 27 and that the vehicles traveled north on Sunday,

November 28 into the early morning hours of Monday, November 29. Each ALPR result

included a picture of the license plate and vehicle; the pictures were used to confirm the accuracy

of each automated license plate read. One picture at the time of the ALPR read (displayed below)

shows Vehicle 2 with suspected chicken wire or wire structures capable of housing roosters in

the truck bed.



34.     On November 28, 2020, at approximately 5:45 p.m., the SCOTT account posted "Jen RuIz was in North Carolina" using the "Check In" feature of Facebook.   The picture below is a screenshot of the post.



### Additional Travel to Suspected Cockfights in North Carolina

35.     During the weekend of December 11-13, ALPR assets in multiple states along the East Coast of the United States documented an additional trip south for the Target Vehicle. Multiple ALPR assets showed that the Target Vehicle traveled south along the Interstate 95 corridor on Friday, December 11 and returned north on Sunday, December 13. Each ALPR result included a picture of the license plate and vehicle; the pictures were used to confirm the accuracy of each automated license plate read.

36.     Information obtained from ALPR records shows that the Target Vehicle, which is registered to SCOTT, traveled south along the I-95 corridor on the weekend of December 11-13. On Saturday, December 12 at 9:06 a.m., the SCOTT Facebook account posted a picture of a

Piggly Wiggly sign that was determined to be located at 107 South Pine Street in Warsaw, North

Carolina. Special Agents of the Office of Inspector General for the U.S. Department of

Agriculture are actively investigating organized cockfighting at a location known to law

enforcement in the area of the location that the picture was taken. Additionally, Special Agents

received information that a cockfight was organized for December 12 at the known location.

December 12 is the same date that the picture was posted. I know from my experience that

Eastern North Carolina is a common location for animal fighting ventures.



37.     On Friday, January 8, 2021, ALPR documented the Target Vehicle traveling

south into North Carolina. A license plate reader showed it parked in the parking lot of a Sleep

Inn in Wake Forest, North Carolina on Friday January 8, 2021. On Sunday, January 10, 2021 and

Monday, January 11, 2021 ALPR recorded the Target Vehicle traveling north consistent with

travel returning from North Carolina.

38.     On Thursday, February 18, 2021, ALPR documented the Target Vehicle traveling

south into New Jersey, consistent with travel to North Carolina. On Sunday, February 21, 2021,

ALPR recorded the Target Vehicle traveling north.  That same day, Trooper Seth Parker of the

Massachusetts State Police conducted a traffic stop on the Target Vehicle on Interstate 93 in

Andover, Massachusetts. PADILLA was the operator of the vehicle. SCOTT was seated in the

front passenger seat along with two children seated in the rear of the vehicle. SCOTT told

Trooper Parker that she and her family were traveling from North Carolina to their home in New

Hampshire. Trooper Parker heard rooster crowing sounds coming from within the vehicle.

SCOTT acknowledged that roosters were in the vehicle and suggested that they purchased them

for their kids. Trooper Parker also observed luggage and cardboard boxes within the vehicle.

Cardboard boxes are a common means to transport roosters that must be kept separate from one

another. No enforcement action was taken as a result of the traffic stop.

<u>Surveillance of the Target Premises</u>

39.     On December 15, 2020, Detective Kennedy Richard of the Chester Police

Department and I conducted surveillance outside 208 Candia Road. I heard a significant amount

of rooster crowing coming from the area of the suspected rooster housing on the property.

40.     On January 4, 2021, USDA-OIG Assistant Special Agent in Charge Christopher

Robinson and I conducted helicopter overflight surveillance at 208 Candia Road with the support

of the New Hampshire State Police Air Wing. The helicopter circled the Target Premises and

observed the property and outbuildings using the helicopter camera. The location was

documented with a standalone digital camera. Multiple structures capable of housing large

quantities of roosters were visible in the rear (north side) of the main house. We observed several

additional outbuildings, and a grey Nissan Armada parked in the driveway.





## AUTHORIZATION REQUEST

41.     Based on my training, experience and information directly gained through this investigation, I believe that SCOTT and PADILLA raise, train, alter, and/or keep roosters used for cockfighting at the Target Premises and I believe that evidence of related crimes will be found there. I also believe that evidence of these violations will be found on cellular telephones used by SCOTT and PADILLA found at the Target Premises. I know that cellular telephones serve many purposes and can contain evidence of these violations including: to communicate with others in the business of cock fighting via text message or telephone call, to store names and phone numbers of co-conspirators, to keep track of roosters, gambling bets, and proceeds related to cockfighting, to store photographs of roosters or cockfights, to make travel arrangements, to use GPS navigation to travel to locations related to cockfighting, and more. I know that SCOTT and PADILLA use Facebook and have associations to cockfighting on that platform. I seek authority to search the text messages, phone calls, contacts, photographs, videos, communication applications, social media applications like and including Facebook and other parts of cellular telephones found in the residences or on the persons of SCOTT and PADILLA for evidence of these violations.

42.     I request that the Court issue a search warrant permitting federal agents and other law enforcement officers to search the residence, exterior property, vehicles, utility trailers, sheds, keeps, coups, barns and all outbuildings of premises described in Attachment A, and seize evidence as specified in Attachment B.

43.     Permission is sought to allow the government to obtain the assistance of Federal, state or local law enforcement authorities, as well as animal rescue groups and/or the U.S. Department of Agriculture Animal and Plant Health Inspection Service to handle and provide

necessary care to any animals seized, in executing the search of the Subject Location described in Attachment A.

43.     The government also seeks permission to allow veterinarians and animal technicians to enter the property to assist with handling of animals once the premises are secure. Specifically, U.S. Department of Agriculture Animal and Plant Health Inspection Service is qualified to examine, document, photograph, video, test, inspect, and otherwise examine animals located at the Subject Location. The federal Animal Welfare Act (AWA) sets general standards for humane care and treatment that must be provided for certain animals. Congress assigned the U.S. Department of Agriculture (USDA) the responsibility for enforcing the AWA. The APHIS is the agency within USDA responsible for ensuring this occurs.

44.     Permission is also sought to allow USDA APHIS, veterinarians, and animal technicians to seize items identified in Attachment B as well as to examine, document, test, inspect, and otherwise examine, and to take photographs or video of any location, item, or individual at the search site, use water and electrical power at search site, to set up necessary equipment, and to establish safety perimeters as government agents deem necessary to accomplish the search. The government also seeks permission to allow USDA APHIS, veterinarians, and animal technicians to enter the property to assist with handling of animals once the premises are secure who may test, document, photograph, or otherwise examine animals. "Necessary care including veterinary treatment shall be provided" to any animal seized, as required by the Animal Welfare Act. 7 U.S.C. § 2156(f).

## BIOMETRIC ACCESS TO DEVICES

45.     This warrant seeks authorization for law enforcement to compel SCOTT and

PADILLA to unlock any cellular telephones requiring biometric access subject to seizure pursuant to this warrant. Grounds for this request follow.

46.    I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users with the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners, facial recognition features and iris recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

47.    If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

48.    If a device is equipped with a facial-recognition feature, a user may enable the ability to unlock the device through his or her face. For example, this feature is available on certain Android devices and is called "Trusted Face." During the Trusted Face registration process, the user holds the device in front of his or her face. The device's front-facing camera then analyzes, and records data based on the user's facial characteristics. The device can then be unlocked if the front-facing camera detects a face with characteristics that match those of the

registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Trusted Face.

49.     If a device is equipped with an iris-recognition feature, a user may enable the ability to unlock the device with his or her irises. For example, on certain Microsoft devices, this feature is called "Windows Hello." During the Windows Hello registration, a user registers his or her irises by holding the device in front of his or her face. The device then directs an infrared light toward the user's face and activates an infrared-sensitive camera to record data based on patterns within the user's irises. The device can then be unlocked if the infrared-sensitive camera detects the registered irises. Iris-recognition features found on devices produced by other manufacturers have different names but operate similarly to Windows Hello.

50.     In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents.

51.     As discussed in this Affidavit, I have reason to believe that one or more digital devices will be found during the search. The passcode or password that would unlock the devices subject to search under this warrant currently is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the devices, making the use of biometric features necessary to the execution of the search authorized by this warrant.

52.     I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric

features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. For example, Apple devices cannot be unlocked using Touch ID when: (1) more than 48 hours has elapsed since the device was last unlocked; or, (2) when the device has not been unlocked using a fingerprint for 8 hours and the passcode or password has not been entered in the last 6 days. Similarly, certain Android devices cannot be unlocked with Trusted Face if the device has remained inactive for four hours. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

53.     In light of the foregoing, and with respect to (1) any device found on the person of SCOTT AND PADILLA, or (2) any device at/on the Target Premises or vehicles on the Target Premises reasonably believed to be owned, used, or accessed by SCOTT and PADILLA, law enforcement personnel seek authorization, during execution of this search warrant, to: (1) press or swipe the fingers (including thumbs) of SCOTT and PADILLA to the fingerprint scanner of the seized device(s); (2) hold the seized device(s) in front of the face of SCOTT and PADILLA and activate the facial recognition feature; and/or (3) hold the seized device(s) in front of the face of SCOTT AND PADILLA and activate the iris recognition feature, for the purpose of attempting to unlock the device(s) in order to search the contents as authorized by this warrant.

54.     The proposed warrant does not authorize law enforcement to compel that an individual present at the Target Premises state or otherwise provide the password or any other means that may be used to unlock or access the devices. Moreover, the proposed warrant does not authorize law enforcement to compel an individual present at the Target Premises to identify

the specific biometric characteristics (including the unique finger(s) or other physical features) that may be used to unlock or access the devices.

55.     As discussed previously in this affidavit, I believe that SCOTT and PADILLA use the Target Vehicle to make periodic trips to North Carolina. On the days that SCOTT and PADILLA made these trips, I believe that they have usually left the Target Premises very early in the morning. Investigators intend to begin conducting surveillance outside of the Target Premises at or around 4:00 a.m. on the morning of the search. If the Target Vehicle is observed leaving the Target Premises between 4:00 and 6:00 a.m., investigators seek authority to execute the warrants prior to 6:00 a.m. Otherwise, investigators will wait until 6:00 a.m. to execute the warrants.

## CONCLUSION

56.     Based upon my knowledge and experience and that of the other law enforcement

officers and agents with whom I have consulted and the facts that I have described, I believe that

there is probable cause that PADILLA and SCOTT are possessing, training, transporting, and/or

selling animals for use in animal fighting ventures, the acts of which have affected interstate

commerce, in violation of 7 U.S.C. § 2156. I respectfully submit that there is probable cause to

believe that the items listed in Attachment B constitute evidence, fruits, and instrumentalities of

the Subject Offenses and that those items will be found at 208 Candia Road in Chester, New

Hampshire, the location described in Attachment A.

Respectfully submitted,

/s/ Kyle Bishop
Special Agent Kyle Bishop
United States Department of Agriculture
Office of the Inspector General

The affiant appeared before me by telephonic conference on this day, the 3rd day of March, 2021, pursuant
to Fed. R. Crim. P. 4.1 and affirmed under oath the content of this affidavit and application.

Hon. Andrea K. Johnson
United States Magistrate Judge

**ATTACHMENT A-1**
**PREMISES TO BE SEARCHED**

The subject premises identified as 208 Candia Road, Chester, New Hampshire including the residence, curtilage, outbuildings (including barns, coups, keeps, and other animal housing), as well as all contiguous property that makes up the approximately 15.75-arce parcel recorded by the Town of Chester Assessing Department as Parcel #007-041-003-000 is particularly described as follows:

A light-colored, two-story single family dwelling located at 208 Candia Road in Chester, New Hampshire with a rear deck and an attached multiple-bay garage as well as the contiguous property and outbuildings. The residence is located at the approximate Global Positioning System (GPS) coordinates of 42°59'05.1"N, 71°16'21.3"W. Additionally, the numbers 208 are visible on the mailbox at the end of the approximately 1800 foot driveway.





**ATTACHMENT A-2**
**VEHICLE TO BE SEARCHED**

The Target Vehicle is described as a grey 2020 Nissan Armada with New Hampshire registration

4835075 and Vehicle Identification Number (VIN) JN8AY2NC1LX516489. The vehicle is grey,

four-door sport utility vehicle (SUV) with tinted rear windows. The below photograph depicts a

vehicle matching the description of the Target Vehicle at the Subject Premises as of the date of

helicopter overflight on January 4, 2021:



## ATTACHMENT A-3

### PERSONS TO BE SEARCHED

The persons of SCOTT and PADILLA, with an address of 208 Candia Road, Chester, New Hampshire. SCOTT is a 34-year-old white female who is approximately 5'5" tall and weighs 120 pounds. PADILLA is a 40-year-old Hispanic male who is approximately 5'11" and weighs 230 pounds.

PADILLA                                    SCOTT




**ATTACHMENT B**
**ITEMS TO BE SEIZED**

All evidence, fruits, and instrumentalities of violations of 7 U.S.C. § 2156 namely:

1.     All live or dead chickens (cockerels and roosters being male chickens and hens being female chickens);

2.     Any papers or membership cards showing affiliation or membership in a game fowl-related organization;

3.     Any papers or receipts showing participation in gambling in an animal fighting venture, or attendance or parking at an animal fighting event;

4.     Cockfighting rule books, fight contracts, call sheets, match sheets, score cards, betting slips, leg or wing bands, training or conditioning records, breeding records, or other written agreements concerning the fighting or trading of birds, in whatever form;

5.     Any photographs, film, video footage, audio recordings, books, magazines, periodicals, writings or other electronic media and writings that discuss or depict cockfighting or training or conditioning of gamecocks for fighting or that pertain to pertain to animal fighting or training;

6.     Schedules, pamphlets, advertisements, and other records related to the organization, sponsoring, or attending animal fighting ventures;

7.     Registration papers or other materials showing ownership, possession or transfer of animals, including bills of sale, pedigrees, breeding records, transport documents, shipping records, certificates, receipts, and veterinary records;

8.      Any records of financial accounts or transactions related to payment for or proceeds from or related to animals, including account statements, deposits, withdrawals, checks, debits, wire transfers, or other documents;

9.      United States Currency in excess of $1,000;

10.     Any animal fighting records, including names and telephone numbers of persons suspected of being animal fighters, and any rules, contracts, training logs or other written agreements concerning the fighting of animals;

11.     Any awards, trophies, plaques, or ribbons promoting or relating to animal fighting;

12.     All animal fighting paraphernalia and cockfighting weapons, including: gaffs, long heels, short heels, jaggers, bayonets, Texas Twisters, socket knives, long knives, short knives, slashers, postizas, scales, and any other sharp implement designed to be attached in place of the natural spur of a gamecock or other fighting bird;

13.     Tools, both mechanical or manual, used for the making of the cockfighting weapons listed above, included but not limited to: grinding wheels, polishing wheels, drills, presses, shears, hole punches, devices for bending and shaping metal, riveters, and other devices made to manipulate metal and leather;

14.     Raw materials used for the making of the cockfighting weapons listed above, included but not limited to, leather, stock metals, rivets (spur sockets) and other materials commonly used or substituted in the construction of these weapons;

15.     The cases used to hold such cockfighting weapons, gaff or knife gauges, sharpening stones, mounting blocks, leather wraps, scabbards, moleskin, tape, waxed string, and sparring muffs;

16.     Materials or items used for the training and conditioning of fowl including, but not limited to sparring muffs, training, dummies, effigy roosters, and any other item or items capable of training fowl for fighting;

17.     Any animal carrying cases, pens, chains, cages, tie cords, enclosures, and portable carrying cases used to restrain, contain, or transport gamecocks;

18.     Drugs or supplements capable of being used to treat injured animals or to enhance their performance; needles and syringes capable of being used for the administration of such drugs; suture or surgical staple kits and other veterinary supplies including but not limited to dubbing shears, spur saws, veterinary drugs and supplies, antibiotics or other drugs used to treat injured fighting cocks or to enhance their performance;

19.     Any constructed enclosures or components of any pits or enclosures capable of being used for the purpose of animal fighting, training animals for fighting, or housing animals intended to be used for fighting, or weight scales or cocker's scales, and any buckets, pails, cans, and sponges used to wash fowl including any carpeting or other materials used on the floor or walls of such enclosures;

20.     Any animal carcasses located or buried on the property, or parts or skins or skeletal remains thereof;

21.     Any utensils or weapons capable of being utilized in the killing of animals, to include ropes, wire, guns, rifles, spent shotgun shells, spent bullet cartridges; buckets, barrels, or other devices capable of being used to drown animals; baseball bats, metal pipes, batteries,

electrical wires and clips, knives; and barrels, flammable substances, and other items capable of being used to burn live or dead animals;

22.     Items of personal property (indicia of occupancy) tending to establish the identity of persons in control of the above-described premises and items, including but not limited to utility receipts, regular monthly bills, addressed mail, and telephone bills; and

23.     Cellular telephones reasonably believed to be used by SCOTT and PADILLA. I further seek to search those telephones for:

a.     Evidence of who used, owned, or controlled the phone at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

b.     Evidence of the Subject Violations including communications with others in the business of cockfighting via text message or telephone call, names and phone numbers of co-conspirators, documents keeping records of roosters, gambling bets, and proceeds related to cockfighting, videos or photographs of roosters or cockfights, evidence of travel arrangements, GPS navigation to travel to locations related to cockfighting, and evidence of the use of the Facebook profiles discussed herein; and

c.     Contextual information necessary to understand the evidence described in this attachment.

DEVICE UNLOCK: During the execution of the search of the property described in Attachment A, and with respect to (1) any cellular telephone on SCOTT and PADILLA's person, or (2) any cellular telephone at/on Premises reasonably believed to be owned, used, or accessed

by SCOTT or PADILLA, law enforcement personnel are authorized to (1) press or swipe the fingers (including thumbs) of SCOTT and PADILLA to the fingerprint scanner of the seized device(s); (2) hold the seized device(s) in front of the face of SCOTT and PADILLA and activate the facial recognition feature; and/or (3) hold the seized device(s) in front of the face of that SCOTT and PADILLA and activate the iris recognition feature, for the purpose of attempting to unlock the device(s) in order to search the contents as authorized by this warrant.